24-mj-6419-MPK<br>24-mj-6420-MPK

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Special Agent Brittney Henning, being sworn, state as follows:

## INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since April of 2021. As such, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

2. I am currently assigned to the FBI's Boston Division as a member of the Metro Boston Gang Task Force ("MBGTF"). My duties include working as a liaison between federal, state, and local law enforcement entities in the investigation of illegal distribution of narcotics, firearm offenses, and associated gang-related violent crimes. In the course of participating in investigations of drug distribution/trafficking, I have conducted or participated in surveillance, the purchase of illegal drugs and firearms, the execution of search warrants, debriefings of subjects, witnesses, and informants and reviews of consensually recorded conversations and meetings. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply. I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3. I was previously employed by the City of Norfolk, Virginia as a Police Officer from December of 2014 to April of 2021, where I was assigned to the Patrol Operations

Division. As a patrol officer, my investigative responsibilities included violent crimes and illegal narcotics use and sales.

4. Based on my training, experience, and information provided to me by other law enforcement officers, I am familiar with the modus operandi used by individuals engaged in the violation of various federal offenses. For example, I have handled cooperating sources and witnesses who have provided information to me specifically related to narcotics. Through my training, knowledge, experience, and information provided to me by other law enforcement officers I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the use and trafficking of illegal narcotics. I have participated in and performed surveillance and made arrests of narcotics traffickers who utilize their electronic devices to further their illegal activity. During the course of my professional experience, I have interviewed numerous defendants, witnesses, confidential informants, and other police officers regarding the illegal trafficking of narcotics.

5. Based on my training and experience as a Special Agent, I am familiar with federal narcotics laws. I know that it is a violation of Title 21 U.S.C. §§ 841(a)(1) and 846, for any person to conspire to, or to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

## **PURPOSE OF AFFIDAVIT**

6. I submit this affidavit in support of a Criminal Complaint charging Isaiah PIERRE ("I. PIERRE"), a/k/a "ZAY," born 1997, and Logan PIERRE ("L. PIERRE"), born 1991, with violating Title 21, United States Code, Section 846 (conspiracy to distribute, and possess with intent to distribute, methamphetamine).

7. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports made to me by agents of the FBI and other federal, state and local law enforcement agencies.

8. I submit this affidavit for the limited purpose of establishing probable cause to believe I. PIERRE and L. PIERRE have committed the above offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

## PROBABLE CAUSE

**I. Investigation Background**

9. The FBI MBGTF are investigating a drug trafficking organization ("DTO") involving I. PIERRE, L. PIERRE, and others, that has been selling methamphetamine in the eastern Massachusetts area, since at least November, 2023. Under the FBI's direction, an FBI confidential informant ("CW-1")[1] has made several controlled buys of narcotics from I. PIERRE and L. PIERRE, which were audio and video recorded.

10. CW-1 has made several controlled buys of narcotics from I. PIERRE and L. PIERRE in this investigation, which were audio and video recorded. During this investigation, CW-1 informed investigators that he had been previously buying methamphetamine primarily from L. PIERRE, but that L. PIERRE was arrested on domestic assault charges and was being held pending a detention hearing. During this time, I. PIERRE, whom CW-1 knew to be L.

---

[1] CW-1 is cooperating for the purpose of seeking consideration towards charging and sentencing related to an ongoing federal drug trafficking investigation. CW-1 has a criminal history that includes prior arrests and convictions for illegal firearm possession, drug distribution, drug possession, operating under the influence of drugs or alcohol, and assault & battery with a dangerous weapon. At the direction of law enforcement, the CW-1 has identified, and corroborated, events and individuals involved in active criminal investigations, including having conducted controlled purchases of evidence in conjunction with this criminal investigation. Based on corroboration during this investigation, including recordings, I believe that CW-1's information is reliable.

3

PIERRE's brother, reached out to CW-1 to continue selling methamphetamine to CW-1 on L. PIERRE's behalf. CW-1 conducted several controlled purchases from I. PIERRE while L. PIERRE was held in state custody. L. PIERRE was released from state custody around February 2024 on GPS electronic monitoring through Massachusetts Probation Services. Once L. PIERRE was released, CW-1 then conducted several controlled purchases directly from L. PIERRE.

11.     For each of the controlled buys in this investigation, law enforcement followed the following procedures: law enforcement officers first searched CW-I and his/her vehicle for money and contraband. Officers then provided to CW-I Official Agency Funds ("OAF") and a recording device and transmitter for use in the purchase. Officers then directed CW-1 to make a controlled purchase of drugs and conducted surveillance while CW-I drove to a prearranged location to meet I. PIERRE, and subsequently L. PIERRE, throughout the transaction, and as CW-1 drove back to a prearranged meet location to meet with officers. There, officers retrieved the narcotics and recording and again searched CW-1 and his/her vehicle for contraband and money, with negative results.

**II.     Controlled purchases**

   a. <u>November 12, 2023</u>

12.     On November 12, 2023, CW-1 conducted a controlled purchase of methamphetamine for OAF with I. PIERRE in Malden, MA. This meeting was captured by covert audio and video recording devices.

13.     Leading up to the day of the controlled purchase, CW-1 communicated with I. PIERRE, who CW-1 knows by his nickname, "ZAY," through a series of phone calls and text messages, during which I. PIERRE agreed to sell methamphetamine to CW-1. During these

4

communications, they agreed to meet in Chelsea, MA, and I. PIERRE subsequently advised CW-1 to meet I. PIERRE in the vicinity of 24 Oakland Street, Malden, MA.

14. Following the series of communications between I. PIERRE and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with the OAF and instructed CW-1 to meet with I. PIERRE and make the drug purchase. Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location at 24 Oakland Street, Malden, MA, where CW-1 parked.

15. Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: CW-1 arrived at 24 Oakland Street; another vehicle parked behind CW-1's vehicle; a few minutes later, that vehicle departed the area; CW-1 subsequently departed from 24 Oakland Street.

16. After CW-1 left the vicinity of 24 Oakland Street, law enforcement officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement officers with a clear sealed bag containing a hard white substance. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results. During the debriefing, CW-1 told agents that following the communications with I. PIERRE, CW-1 met with I. PIERRE in CW-1's vehicle and he/she purchased the suspected methamphetamine in exchange for the OAF. I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1.

17. The clear sealed bag contained a hard white substance. Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape &

color of the substance. The suspected narcotics field tested positive for the presumptive presence of methamphetamine. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, which found that the substance was identified as a net weight of approximately 446.8 grams of Methamphetamine Hydrochloride, with a substance purity of 100% ± 7%.

    b.  <u>January 18, 2024</u>

18.    On January 18, 2024, CW-1 conducted a controlled purchase of methamphetamine for OAF with I. PIERRE in Malden, MA. This meeting was captured by covert audio and video recording devices.

19.    Leading up to the day of the controlled purchase, CW-1 communicated with I. PIERRE, through a series of phone calls and text messages, during which I. PIERRE agreed to sell methamphetamine to CW-1. During these communications, they agreed to meet in Everett, MA, and I. PIERRE subsequently advised CW-1 to meet I. PIERRE in the vicinity of 24 Oakland Street, Malden, MA.

20.    Following the series of communications between I. PIERRE and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with the OAF and instructed CW-1 to meet with I. PIERRE and make the drug purchase. Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location at 24 Oakland Street, Malden, MA, where CW-1 parked.

21.    Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: CW-1 arrived at 24 Oakland Street; a black Nissan

Rogue bearing Texas registration FL843AAN [2] parked behind CW-1's vehicle; CW-1 met with an individual; a few minutes later, CW-1 departed from 24 Oakland Street.

22.  After CW-1 left the vicinity of 24 Oakland Street, law enforcement officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement officers with a clear sealed bag containing a hard white substance.  Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results.  During the debriefing, CW-1 told agents that following the communications with I. PIERRE, CW-1 met with I. PIERRE in CW-1's vehicle and he/she purchased the suspected methamphetamine in exchange for the OAF. I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1.

23.  The clear sealed bag contained a hard white substance.  Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. Additionally, I believe this based on various factors, including the information learned during the course of this investigation and the packaging, size, shape & color of the substance.  The suspected narcotics field tested positive for the presumptive presence of methamphetamine. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, which found that the substance was identified as a net weight of approximately 444.7 grams of Methamphetamine Hydrochloride, with a substance purity of $78\% \pm 5\%$.

---

[2] Investigators conducted a database check of Texas registration FL843AAN, which revealed no valid registered vehicle with that license plate.  Investigators believe that this may be a rental vehicle and continue to try and locate more information about this vehicle's registration and ownership.

  c. <u>March 12, 2024</u>

24. As referenced above, once L. PIERRE was released, CW-1 then conducted several controlled purchases directly from L. PIERRE. On March 12, 2024, CW-1 conducted a controlled purchase of methamphetamine for OAF with L. PIERRE in Malden, MA. This meeting was captured by covert audio and video recording devices.

25. Leading up to the day of the controlled purchase, CW-1 communicated with L. PIERRE, who CW-1 also knows by his nickname, "LO," through a series of phone calls, during which L. PIERRE agreed to sell 1 pound of methamphetamine to CW-1. During these communications, they agreed to meet in Malden, MA, and L. PIERRE subsequently advised CW-1 to meet L. PIERRE in the vicinity of 108 Porter Street, Malden, MA.

26. Following the series of communications between L. PIERRE and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with the OAF and instructed CW-1 to meet with L. PIERRE and make the drug purchase. Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location 108 Porter Street, Malden, MA, where CW-1 parked.

27. Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: CW-1 arrived at 108 Porter Street; a blue Ford Bronco bearing MA registration 5PMT39 [3] (the "blue Ford Bronco") parked near CW-1's vehicle; CW-1 met with an individual identified as L. PIERRE; and a few minutes later, CW-1 departed from 108 Porter Street.

28. After CW-1 left the vicinity of 108 Porter Street, law enforcement officers surveilled CW-1 to a predetermined location and CW -1 provided law enforcement officers with

---

[3] Investigators conducted a database check of Massachusetts registration 5PMT39, which revealed it to be a Hertz rental vehicle.

a bag containing a hard white substance. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results. During the debriefing, CW-1 told agents that following the communications with L. PIERRE, CW-1 met with L. PIERRE and he/she purchased the suspected methamphetamine in exchange for the OAF.

29. CW-1 also informed investigators that L. PIERRE advised CW-1 of several things, including that he would send his brother (I. PIERRE), to California to purchase more crystal methamphetamine. L. PIERRE also stated the pound of crystal methamphetamine that he just sold CW-1 was unsold product from before he went to prison. I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1.

30. The bag contained a hard white substance. Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. The suspected narcotics field tested positive for the presumptive presence of methamphetamine. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, which found that the substance was identified as a net weight of approximately 444.8 grams of Methamphetamine Hydrochloride, with a substance purity of 99% ± 7%.

31. Following this controlled purchase, investigators attempted to surveil the blue Ford Bronco, but lost the vehicle during surveillance. Approximately six minutes after the vehicle left the area of 108 Porter Street, investigators observed the blue Ford Bronco parked in front of the TARGET LOCATION, L. PIERRE's residence in Malden, Massachusetts.[4] The

---

[4] I am aware of L. PIERRE's residential address, hereinafter referred to as the TARGET LOCATION. I am not including that specific address for the purpose of this affidavit in support of a criminal complaint.

9

vehicle was empty, and as investigators drove by the area, they observed that the lights inside the TARGET LOCATION went from being off to being turned on.

    d.  <u>March 24, 2024</u>

32.    On March 24, 2024, CW-1 conducted another controlled purchase of methamphetamine for OAF with L. PIERRE in Lynnfield, MA. This meeting was captured by covert audio and video recording devices.[5]

33.    Leading up to the day of the controlled purchase, CW-1 communicated with L. PIERRE through a series of phone calls and text messages, during which L. PIERRE agreed to sell 1 pound of methamphetamine to CW-1. During these communications, they agreed to meet in Wakefield, MA, and L. PIERRE subsequently advised CW-1 to meet L. PIERRE in the vicinity of 1355 Market Street, Lynnfield, MA, which is a Burton's Grill & Bar restaurant.

34.    Following the series of communications between L. PIERRE and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with the OAF and instructed CW-1 to meet with L. PIERRE and make the drug purchase. Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location, 1355 Market Street, Lynnfield, MA, where CW-1 parked.

35.    Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: CW-1 arrived and entered the restaurant at 1355 Market Street; the blue Ford Bronco was parked near the restaurant; CW-1 and L. PIERRE exited the restaurant and entered the blue Ford Bronco together; and CW-1 exited the blue Ford Bronco and then departed from 1355 Market Street.

---

[5] During this controlled purchase, agents learned that CW-1's recording device malfunctioned during the controlled purchase and the recording is incomplete. As a result, the exchange within the blue Ford Bronco was not captured on audio/video recording.

36. After CW-1 left the vicinity of 1355 Market Street, law enforcement officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement officers with a bag containing a hard white substance. Law enforcement officers then searched CW-1 and his/her vehicle again, with negative results. During the debriefing, CW-1 told agents that, following the communications with L. PIERRE, CW-1 met with L. PIERRE in L. PIERRE's vehicle, and he/she purchased the suspected methamphetamine in exchange for the OAF.

37. CW-1 also informed investigators that L. PIERRE advised CW-1 of several things, including that he is attempting to re-build his drug trafficking business after being in prison for an extended period. L. PIERRE stated that his brother (I. PIERRE) and cousin (Jonathan Franklin) ruined his drug trafficking business. He stated that they (I. PIERRE and Franklin) cuffed his drug dealer clients product and when it was time to collect payment, the drug dealers would not pay or answer any phone calls. I have also reviewed the incomplete video recording of this controlled purchase and determined that what was captured is consistent with the details described by CW-1.

38. The bag contained a hard white substance. Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. The suspected narcotics field tested positive for the presumptive presence of methamphetamine. The packaged evidence weighed 478.3 grams. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, and results of the laboratory examination are pending.

39. Following this controlled purchase, investigators observed the blue Ford Bronco leave the area of 1355 Market Street, however surveillance was lost shortly thereafter. Approximately 22 minutes later, investigators observed L. PIERRE arrive at the TARGET

LOCATION in the blue Ford Bronco. L. PIERRE was observed to park his vehicle and enter the TARGET LOCATION.

      e.  <u>May 5, 2024</u>

40.     On May 5, 2024, CW-1 conducted another controlled purchase of methamphetamine for OAF with L. PIERRE in Malden, MA. This meeting was captured by covert audio and video recording devices.

41.     Leading up to the day of the controlled purchase, CW-1 communicated with L. PIERRE through a series of phone calls and text messages, during which L. PIERRE agreed to sell 1 pound of methamphetamine to CW-1. During these communications, they agreed to meet in Malden, MA, and L. PIERRE subsequently advised CW-1 to meet L. PIERRE in the vicinity of 108 Porter Street, Malden, MA.

42.     Following the series of communications between L. PIERRE and CW-1, law enforcement officers followed the procedures described above, provided CW-1 with the OAF and instructed CW-1 to meet with L. PIERRE and make the drug purchase. Law enforcement officers subsequently surveilled CW-1 to the pre-arranged meeting location, 108 Porter Street, Malden, MA, where CW-1 parked.

43.     Agents, while monitoring the controlled purchase via physical surveillance and the transmitter, observed the following: CW-1 arrived at 108 Porter Street; the blue Ford Bronco arrived and parked near CW-1's vehicle; CW-1 met with an individual identified as L. PIERRE; and a few minutes later, CW-1 departed from 108 Porter Street.

44.     After CW-1 left the vicinity of 108 Porter Street, law enforcement officers surveilled CW-1 to a predetermined location and CW-1 provided law enforcement officers with a bag containing a hard white substance. Law enforcement officers then searched CW-1 and

his/her vehicle again, with negative results. During the debriefing, CW-1 told agents that, following the communications with L. PIERRE, CW-1 met with L. PIERRE and he/she purchased the suspected methamphetamine in exchange for the OAF. I have also reviewed the video recording of this controlled purchase and determined that it was consistent with the details described by CW-1.

45. The bag contained a hard white substance. Based on my training and experience, as well as that of other agents familiar with this investigation, the substance is believed to be methamphetamine. The suspected narcotics field tested positive for the presumptive presence of methamphetamine. The packaged evidence weighed 486.0 grams. The suspected methamphetamine was entered into evidence and subsequently sent to the DEA Laboratory, and results of the laboratory examination are pending.

46. Prior to this controlled purchase, investigators established surveillance at the TARGET LOCATION and observed the blue Ford Bronco parked outside. Investigators observed L. PIERRE exit the TARGET LOCATION, enter the blue Ford Bronco, and drive away. Investigators observed, via electronic and physical surveillance, that L. PIERRE arrived in the area of 108 Porter Street approximately three minutes later.

## CONCLUSION

47. Based on the foregoing, there is probable cause to believe that on various dates, including from on or about November 12, 2023 through on or about May 5, 2024, in Malden, and Lynnfield, in the District of Massachusetts, and elsewhere, that I. PIERRE and L. PIERRE, did conspire to distribute, and possess with intent to distribute, methamphetamine, in violation of Title 21, United States Code, Section 846.

I declare the foregoing is true and correct.

/s/ Brittney Henning
_____
Brittney Henning
Special Agent, FBI

Signed electronically and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this ___ day of June, 2024.    June 11, 2024

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

14